24-2917. Council, today is all yours, this afternoon anyway, so when you come up, take a moment at the podium, make sure it's adjusted comfortably and make sure the microphones are aimed right at your mouth so we can hear you well. I understand everyone is ready and we can proceed. Thank you. All right, Ms. Kelman, I see you've reserved two minutes for rebuttal. You can begin when you are ready. Thank you. May it please the court. My name is Susan Kelman and I represent the appellant here, Anthony Abreu. I think it's not often that we get before this court with a single element. I'm going to ask you, actually, as we get started, pull that other microphone, pull them both so they're aimed right at you. Thank you. How's that?  Okay. It seems to me that this case turns on a single element of the federal murder for hire statute. Section 1951 requires proof that the defendant agreed to commit the murder in exchange for something of pecuniary value. And the term that this court used in Frampton and in many other cases is the requirement of a quid pro quo. And that quid pro quo, that element of significance, pecuniary significance, has to occur at the time the agreement is made. Not 17 months later and not any time later, but prior to the commission of the murder. It is a part of the agreement. It is a requirement of the statute. Does the exchange have to be made at the time or does the agreement for payment have to be made at the time? The agreement, Your Honor. Okay. And what happens in this case is, of course, there is ample evidence of agreements, but none of them involve Mr. Abreu. There is evidence that Alan Yu approaches Yu Yu and says... But isn't there plenty of evidence of a relationship between your client and Mr. Katz so that the agreement with Katz could be a jury could find was an agreement with him? I think, Your Honor, that the — I'm not sure if I'm understanding, Your Honor, but the agreement that my client — my client worked for a fellow named Zhang. And he did do many different things for Mr. Zhang. He was involved in his marijuana business. He was involved — sometimes Mr. Zhang got very drunk. He was a good friend of his. He would take him home. So he was involved in many aspects of Mr. Zhang's business. But with respect to the marijuana business, was his role not that he was someone who sold goods on consignment from Mr. Zhang? Sometimes he sold goods on consignment, Your Honor, and sometimes he would pick up drugs or deliver drugs for him and also pick up drugs for him and also pick up money for him. So he played many different roles within the marijuana business. And one can assume he was paid for that. There's no evidence that he was paid for that. But that is what he did for part of his living. He also — there's evidence that he also repaired cars and that he had repaired cars for Mr. Zhang as well. But he did do a number of different business-like things for Mr. Zhang. And my question is, can, you know, on our very, very broad, what a jury can find, which I may not like, but it is what we've held again and again, couldn't a jury find that that relationship was enough so that they could say that there was a contract agreement, agreement, whatever that means, with your client as well as — Absolutely not. And I say that because — That's the key, isn't it? That is the key, Your Honor, and you've touched it 100 percent. But this Court has also answered that exact question time and time again in the Frampton case. Because in the Frampton case, this Court made it clear that it is not some casual kind of situation. There has to be an agreement before the murder, and the agreement, at the time of the agreement, has to be for something of pecuniary value. But Mr. Abreu is convicted of conspiracy to murder for hire and aiding and abetting murder for hire. Correct. So is it enough for him to be convicted on those two charges that his co-defendants agreed to exchange something of pecuniary value at the time they agreed to the murder? Only if he knew. And do you raise that — I know you raise that in the district court. Do you raise that here on appeal? We do, Your Honor. And where do I find that? I can — You can do it on rebuttal. I think that's a very fair question, but the reality is that he has — in order for him to be responsible or liable for what his — for what Zhang has agreed to, he has to know about it. And we know from the evidence that he's not at a single meeting where money is discussed. He's not at a single meeting where the business aspect of this is discussed. And he plays no role in it. Now, for him to — I mean, the simplest example is a drug transaction — a drug conspiracy. Does the person who's conspiring with the drug dealers or the person who's aiding and abetting the drug dealers, does that person have to know that it's a drug deal? Yes. Do they have to know every aspect of the drug deal? No. But here, this Court has repeatedly said that whether it's the substantive count or a conspiracy or an aiding and abetting, that person must know that there is an agreement to pay — or to give something of pecuniary value in exchange for — quid pro quo is the term that this Court used — in exchange. And there's no evidence here that Mr. Abreu was ever at a meeting or ever had a conversation with anybody that indicated before — before the murder that he would be reimbursed or that he would receive — reimbursed is the wrong word. I apologize. But that he would receive anything of value, of pecuniary value for his services. Does the fact that he received some things after, like the watch and things, together with his contact to Zang, allow a jury to make that connection? The receipts were exposed, okay. I would say — You know, I get money. I'm in contact with somebody who has said, I'll give you money if you do this. Is that enough so that the jury can link the two things together? Well, the person who said, I'll give you money if you do this, was Yu Yu and Zang — Yu Yu and Alan Yu to Zang, but never to — I understand. Okay. And then what I'm saying is that the fact that your client ends up getting money, which they do, he does, together with the comments to Zang and your client's relationship to Zang, allow a jury, under our very easy jury things, to say there is a connection. And I would say to Your Honor, respectfully, no. First, the time when my client says — he holds up the watch and says, this is what I got for the work I did, that's 17 months later. So to connect that to a pre-murder agreement seems far-fetched. I think there's no doubt that some of the things he got were for work that he'd done. You know, I think there's no doubt that some of it was something that one would say was not connected. My question is, was there enough enough of a link to make the connection? And you say, no. I think there's nothing. And not just not enough. I think that there is no proof that his comment about the watch and doing work, and this is what I got for the work I did 17 months later. But I don't think that that would satisfy you. I do want to make one point. There are cases in this circuit and in other cases where there is payment that comes after the fact. And a case that the government relies on is a case where a fellow is hired by a drug dealer to go out and commit a murder. And the fellow who hires him has two men take him to the place where he's going to commit the murder. He goes into the store. He commits the murder. They get in the car. They go right back to the boss, and the boss pays him $1,000. So there could a jury infer that he expected to get that money? It was one minute after the murder occurred. The guy hired him to do it. He went out, he did it, and he got paid. That's not what happened here. There were meeting after meeting after meeting with people about the contract, about the agreement, about the money, about the aspects of the money. This court held in Zhang that money was, that the pecuniary value was. You've pointed out a number of things like fixing cars, delivering goods, or picking up goods. Is there anything at all that remotely could approach an explanation for a payment of $100,000? I think there probably is. We don't know, but maybe he hadn't paid them in two years. We don't know what their payment arrangement was, and we don't know how often he got paid. And we don't know what that, well, we don't know what that watch was worth. The government had an expert on the stand and didn't ask. There is testimony that, oh, it was a very expensive watch, and watches like that can cost over $100,000. But at the same time, you can get one that looks exactly the same around the corner on Canal Street. But again, we're trying to see whether a jury can infer something. And if you have a contract and Zhang, you have a relationship between Zhang and your person, and you have your person receiving an amount of money which cannot be, which was not explained in terms of work done. Now, I'm not saying it couldn't be, but there wasn't any explanation before the jury. Can't a jury in those things make the link? You say no, but Jeepers, I wonder if somebody were to ask me as an ordinary person, is that likely to be what happened, or is it possible? It sounds awfully likely, doesn't it? Well, I think awfully likely, I would hope, is not a standard that we apply in this court. You know, it's possible is not a standard that I would hope this court applies. But the reality is we don't, you know, if there were any evidence of this, perhaps we know that after the fact, after the murder, that Zhang wasn't getting paid, and that Zhang complained to you, and you complained to Alan, Alan Yu, and there was a lot going on over many, many months about failure to pay. At no time did Zhang say anything like, look, you've got to pay me because I've got to pay my guy. Never said that. And that would have been great, easy evidence of those, pay me, but it's important that you pay me because I also have to pay my guy. And I recognize that the standard here for the jury is very, very low. The bar is very low to reverse this case on the one hand. On the other hand, where there is, the government says that they have overwhelming evidence of a pre-murder agreement to exchange something that has pecuniary value. They have nothing that shows any pre-arrange, any pre-argument, any pre-murder agreement. It just is nothing. And to try to extrapolate it through conspiracy law or aiding and abetting, I would submit, doesn't satisfy the requirement that the conspirator, as it were, or the aid or abetter, must know what the fundamental issue is. And otherwise, what we're talking about is murder. And he could be prosecuted across the street. I think we have your argument. Thank you. All right. We'll hear from you in rebuttal. We'll hear from the government. Thank you.  May it please the Court. Good afternoon. My name is Eric Silverberg, and I represented the government before the district court. The evidence at trial established that Anthony Abreu was a hired gun who agreed to kill a co-defendant's business rival for money. Now, you just heard a number of times from my adversary say there's no evidence of an agreement. Respectfully, that's not accurate. I would refer the Court to Appendix Page 1252. It was referenced, the Instagram messages in the— Those are post hoc, though, right? They are post hoc. Of course, under Babylonia, we can look to post hoc conduct. Sorry, I'm getting a little bit of an echo. I don't know if you can hear me. It's fine. Sorry. We, of course, can look to post hoc conduct or behavior to prove a pre-murder agreement. To support an inference, certainly. But I think it's fair to say that there was no direct evidence of an agreement between Mr. Abreu to receive anything of value at the time the murder was planned, right? There's the evidence that comes later that allows us to retrospectively infer that they wouldn't have paid him if they hadn't agreed to pay him, right? But what else is there at the time, either to show that there was an agreement between Mr. Abreu and anyone else or that Mr. Abreu was aware of the agreements between the others? So I agree that there's no evidence directly tied that exists before the murder as to repayment. But I want to unpack the watch and the movement of the watch and the timing of that watch because I think it really does speak to the existence of a pre-murder agreement, and also I want to look at the evidence holistically. So first of all, there was a reference to the fact that this watch was 17 months after. The murder happens in February 2019. There's a meeting among Mr. Abreu's co-conspirators, Alan Yu, Yu Yu, and Xi Zhang, saying, I'm going to wait on the timing of my payment because I don't want money movement. It will look suspicious. Who is saying that? Alan Yu says that to Xi Zhang and Yu Yu. That is a meeting in March, on or about March 2019. And I will find the appendix in a minute. I just want to make sure when you say there's a meeting of three people and then you say someone says, that we're clear on who's saying what to whom. Correct. Xi Zhang is paid by Alan Yu December 2019. Anthony Abreu has this watch. First of all, Anthony Abreu testified he received the watch in 2019. So we're not talking months or years later as 17 months would suggest. It was exchanged the same year. And just between the timing of when Xi Zhang was paid and when we see from the documentary evidence that Abreu has this watch, it's at the latest February 2020. So there's not this big passage of time. Then, of course, it is who is paying him, Xi Zhang. Judge Lynch referred to the fact that they have a consignment relationship. That is absolutely correct. Xi Zhang, there's ample evidence in the record that Zhang was the employer or the contractor. Abreu was the employee, the supplier, the subcontractor of Zhang. They had a business relationship. That is very important. This entire transaction was business for everyone. But how do we know it was this business? I think that's one of the questions, right? So even if Mr. Abreu is Mr. Zhang's shooter, if he's his trigger man, and if this payment is to kill five other people, you know, that's a different crime, though, right? So how was the jury entitled to infer that the watch or any other payment was payment for this murder? So first of all, this contrary or alternative theory of payment was put before the jury when the defendant took the stand. So it was tested, it was considered, and it was not credited. That's the first thing. Wait, I'm sorry. I didn't understand that. I'm sorry. So this suggestion that it was a payment for something else? Yeah, yeah. I'm asking you from what was the jury entitled to infer in light of that known relationship that this payment was for this murder? It was a very valuable, ultra-luxurious watch that has a value or a perceived value of anywhere between $170,000. There's testimony that it's worth two to three times that on the secondary market. That dwarfs the nature of the other business relationships between citizens. But I thought the evidence showed that he was not only Mr. Zhang's – he didn't only assist him in dealing, that he is, quote, his trigger man. Is that not in the evidence? Generally, that he's like, I've got a shooter for you. I've got a professional. That is. Okay, so he could have been paid to shoot someone else. There is no evidence that he – There are many things that could have been, but I want to focus on one particular thing that you said. This is not a case in which the defendant stood silent, put the government to its proof, and argued reasonable doubts only. This is a case in which he testified himself. Now, what did he say about what the work was? Did anybody ask him? You have this Instagram thing where you say, I got this from doing – because somebody owed me $100,000 for work. Did anyone ask him what work? He said it was related to their marijuana business. He didn't explain, and there is no explanation for the fact that that inverts the consignment relationship that they had. There's no explanation. He didn't say it was for shooting other people. That's correct. He did not. He didn't say it was for fixing cars. He did not say it was for fixing cars. He didn't say it was because I was sort of a gopher and I had a salary, and the salary was $50,000 a year and I didn't get paid for two years. He didn't say that, did he? None of those things were said by the defendant, Your Honor. And so what inferences can the jury draw from what they conclude about the credibility of Mr. Ebreu based on his testimony? I think it's clear from the jury's verdict that they did not credit his testimony. Now, it's not the issue before the court today, but the defendant took the stand and made an alibi defense that he was at a laundromat until 3 a.m. sitting outside, and he had – and so there's a text message between him and ZZ. Right. I mean he said he didn't do it. That's a separate question as to whether they believe that or the evidence – the ample evidence that he did do it. But as far as the question of why he got this money, he had every opportunity to explain that, and he did attempt to explain it to the jury. That's correct, and they discredited it. And the most he was able to say is it had something to do with marijuana, basically. That's correct. I do want to get back to Judge Merriam's question, which is like what other evidence is there that we can look to in the record? So first of all, as I've said, the relationship between ZZ and Anthony Ebreu is obviously critically important. ZZ is parting with something that is – and this goes to whether he has knowledge of Zang's benefit, his pre-murder agreement. I would say respectfully there's enough to conclude on this record that Anthony Ebreu alone came to an agreement with Zang. Let me tell you what worries me about this kind of case. You have somebody, Ebreu, who's obviously in the eyes of a jury a bad guy because there is plenty of evidence that he agreed to do all sorts of terrible things. At that point, it is awfully easy for a jury to say, well, there is enough to link him to this particular horrible thing. And it's there that I think courts have to ask, is there enough for the link to this particular thing? When you have a jury that is going to find against this guy because there's plenty of evidence this guy should go off, period. So that's my question. Is this something where we have to look with special care? Your Honor, again, this particular issue on the element of the murder-for-hire statute was vigorously argued and put before the jury. I don't believe this is a case where the jury concluded bad guy, murder, whatever the elements are, murder. The question of whether he was promised something of pecuniary value before the murder was vigorously argued and contested. Beyond the direct evidence that I've discussed, there is ample circumstantial evidence that Anthony Ebreu acted like a professional, that he was hired. They all describe this as a job and as work. Anthony Ebreu made a significant financial investment in this murder. That does not make sense unless you have an agreement to be compensated. So he bought a car, for example, and then he dumped the car a few days later. He disposed of a gun. He got a burner phone. He got latex gloves. He treated this like the professional that he was made out to be. We cited Anderson for, not for this proposition, but I do think there's a compelling inference to be drawn when a defendant is the trusted person in a conspiracy. This defendant was entrusted with the most important task in a murder-for-hire, which is pulling the trigger, and it had the most risk. I think the Court can conclude here with all of the other evidence, the messages, the relationship with Zhang, the significant financial investment that he made, that this person was entrusted with that responsibility because he knew about, and it was a party to this entire agreement, which was this was business for everyone, for Xu Zhang, for Yu Yu, and for Anthony Ebreu. I see I'm over my time. I apologize. Let me ask you one quick question. Should we, and if so, in what way? Should we take into account the jury's note that actually asks about knowledge? Should we think about that, and does it support your position that they were really thinking hard about this, or does it support an idea that maybe it wasn't all that clear? Should we think about it, and if so, how? I don't—of course, the Court is entitled to consider it, but whether—what weight you should afford it, I assume that you should not afford it any weight. We can't possibly know. I mean, I think what we can say, and I think this supports the government's position, is the jury carefully considered this case, and they considered the elements of the crimes that were charged. They returned a guilty verdict, and I submit that that verdict should be respected. Well, they were instructed that the element of an agreement to provide a thing of value was a necessary element of the offense. Yes, Your Honor. And they asked a question about the knowledge, right? That's correct. At least we know they cared about it. I submit that they did. Thank you. Thank you, Counsel. All right, we'll hear from Ms. Kelman. You have two minutes for rebuttal. Thank you, Your Honor. I apologize for not remembering exactly who asked this question, but it was an excellent question. And the question was, when Mr. Abreu was on the stand, did the government ask him if he got the watch in exchange for the murder? And they did not. And I think that that itself speaks volumes. Why? He would have said no, right? Is the question really whether he explained what the payment that he did get was for? Well, the bottom line is that that is the issue here, and they had him on the stand. And they could argue that he lied about it, but they never even asked him about it. So I think that that is relevant. And I think also there is no evidence at all in the record that Mr. Abreu was aware of any of the business arrangements that were made between Zhang and Yu Yu and Yu Yu and David Yu. They were meeting after meeting. They were fighting about who was getting paid and why they didn't get paid and when were they going to get paid. And none of those meetings involved business. The thing that is totally mysterious to me is if we accept that the evidence was amply sufficient to prove that he killed this guy, what possible reason did he have for doing that? If it was because Xi Zhang told him to, and then there's also evidence that he worked on a regular basis for Xi Zhang, for which he was presumably compensated in some way. It's just because they were friends? Well, I think the bottom line is, Your Honor, in Frampton, this court has said he has to have knowledge of a pre-murder arrangement. But the question is, given if we agree that he killed him and that he had these things and that he got some money afterwards, can a jury make that link? You say no, but it seems to me that that's a, you know, whatever reason, so why not this? Because I think the jury shouldn't be allowed, as low as the standard is, Your Honor, the jury shouldn't be allowed to just guess or assume without some basis. And I would suggest that it's not enough of a basis that they have a relationship. It's not enough of a basis to say, oh, that was a pre-murder agreement. The basis that you're providing, in effect, is he was in a general way – what he said, he worked for Zhang in his marijuana business. Suppose he had no idea about the relationship between Xi Zhang and these other guys who wanted the victim killed. All he knows is that I work for this man, and he is asking me as part of my job to kill this guy. And then I get paid for what I do, because that's what you do when you're an employee for an employer. You do what they ask you, and you get paid. Why isn't that – I mean, that's not a sufficient – it has to be – it has to be piecework? Well, I don't think it has to be piecework, Your Honor, but they – the testimony was that he's a shooter. How do we know that he got the watch for that shooting? I mean, can we just punish him for any shooting that he might have done because he got a watch? If his job is to shoot people for Xi Zhang, and he gets paid for being the guy who shoots who Xi Zhang wants shot, why isn't that job, which is – that's the defense, is maybe he shot somebody else for Xi Zhang? Well, I don't know the answer to that, Your Honor, but my instinct tells me that what Your Honor is suggesting, that no matter what he does for Xi Zhang, no matter what Xi Zhang does in his own arrangements, his own agreements or whatever, that all of that will be visited on Anthony Abreu, and I just don't think that the law allows that. I mean, there's a leap that Your Honor is making that the government made in its summation. We have no evidence, but you should assume that this is the case. You should infer it because he does other work for him, and so you should assume that he knows why he got the watch. But what if – I mean, you can infer also from the fact that he did various things that look like what a professional does. He expended money in connection with acquiring some of the implements for this killing, but we cannot infer that he was going to profit from this killing. No, we cannot infer that before he did the murder that he knew that he would be paid for it, that there was something of pecuniary interest in it for him. He didn't know that, and there's no evidence that he knew – you can say, well, why would he do it if he wasn't going to get paid? Fine, but that's not something from which a jury can draw an inference. That's nothing. It's saying we have nothing, but it makes sense. It's not nothing at all. If it makes sense from all of the circumstances, then all of the circumstances are evidence from which one can draw an inference. Except that holding up the watch and saying this is what I got for the work I do could have been any work. It doesn't have to be this work, and the statute in this court has always held under Frampton that it has to be proof for this work, in other words, for the murder. Not for any murder or not for any work he does. There's nothing that ties that watch and that statement to the murder of Mr. Gu. Suppose we had a written contract between the two that said your job for me is to kill who I say you kill. It doesn't say, and he'll get paid. It just says your job is to kill who I want you to kill, and he signs on the dotted line. Are you telling me that there would still need to be some evidence that some particular quantum of what he gets paid on a regular basis or on an intermittent basis from the person with whom he has that contract was for a particular assignable, some portion of his pay has to be assignable to that particular murder rather than to a general agreement that you will get paid for what you do and this is part of your duties? Well, first of all, Your Honor, respectfully, we don't have an agreement to that effect. That's why it's a hypothetical. If you had it, you would not be here making this argument, right? That's possible. Because clearly if there was such a generalized agreement and this act was committed in furtherance of that general agreement, that would be legally sufficient. If it was for that specific, yes, if it was for that specific issue, yes. But that's exactly what we don't have here. Not for the specific murder, just that he would murder whoever he was told to. In exchange for something of security? Because that's what an employment relationship involves. Right, and we don't have that here. What we have is some generalized thing about he does what, I mean, he fixes cars, he shoots people, he delivers marijuana for me, he collects it. We don't know when he gets paid, how he gets paid. So we have to decide what a jury would be allowed to say the agreement between him and Zhang was? Without any evidence. That's the question. Is there enough evidence so that a jury could say that there was an agreement which, if not in the details of what my learned colleague has said, is close enough to that, so that that's the agreement, which you say, if it were there, would be sufficient? Respectfully, Your Honor, it seems to me that the suppositions that the court is making fly in the face of everything you've written in Frampton and since Frampton. And I just want to, I don't know if I need to address this at all, but the government's suggestion that, you know, there could be an arrangement to pay later, and they cite cases in their brief to that effect. Again, that was five minutes after the murder. That was, go shoot this guy, I shot this guy, and get $1,000. That's not 17 months later. And I just want to put that out there. But I do think that there has to be something from which the jury can extrapolate and just to generalize. I think all your cases have said it can't be some generalized idea. The co-conspirator and the aider and abetter and the actor have to have a specific knowledge of an agreement, a pre-murder agreement, to get something of pecuniary value. Thank you.  Thank you all. Thank you for coming in in the afternoon today.